**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x

ADELE BASILE,

                       **Plaintiff,**

               - against -

GGP STATEN ISLAND MALL, LLC,
BROOKFIELD PROPERTIES RETAIL GROUP INC.,
and BRIGHTVIEW LANDSCAPES, LLC,

                       **Defendants.**
--------------------------------------------------------------------x

**CORRECTED SECOND AMENDED COMPLAINT[1]**

**Case No. 1:22-cv-02572 (RER)**

**JURY TRIAL DEMANDED**

       Plaintiff **ADELE BASILE** ("Plaintiff") by her attorneys, Law Offices of Arnold N. Kriss, complaining of Defendants **GGP STATEN ISLAND MALL, LLC**, ("Defendant GGP") **BROOKFIELD PROPERTIES RETAIL GROUP, INC.** ("Defendant Brookfield Retail") and **BRIGHTVIEW LANDSCAPES, LLC** ("Defendant Brightview") and/or collectively as ("Defendants") respectfully alleges upon information and belief:

**PARTIES**

       1.     Plaintiff is an individual and citizen of the State of New York, County of Richmond.

       2.     Defendant GGP is a New York State foreign limited liability company incorporated in the State of Delaware.

       3.     Defendant GGP, by Defendant Brookfield Retail's Chief Executive Officer Jared W. Chupaila, manages, controls and supervises the Staten Island Mall, 2655 Richmond Avenue, Staten Island, New York 10314 ("the Mall") from Brookfield Retail's principle office at 350 N. Orleans Street, Suite 300, Chicago, IL 60654-1607.

---

[1]    Defendants GGP and Brookfield, by their counsel, have consented to the filing of a Second Amended Complaint.  Fed. R. Civ. P.15(a).

4.      Defendant Brookfield Retail is a New York State foreign company incorporated in the State of Delaware.

5.      Defendant Brookfield Retail has its principle office at 350 N. Orleans Street, Suite 300, Chicago, IL 60654-1607.

6.      Defendant Brookfield Retail has managed and/or still manages, controls and supervises the Mall.

7.      Defendant Brightview is a New York State foreign limited liability company incorporated in the State of Delaware.

8.      Defendant Brightview has its office at 1350 Liberty Avenue, Unit C, Building 22, Hillside, New Jersey 07205.

9.      Defendants GGP and Brightview entered into an Exterior Landscape Maintenance Agreement ("Agreement") of the Mall for the period of January 1, 2019, to December 31, 2021, to provide maintenance services of the Mall as set forth in the Agreement.  (Exhibit A).

## JURISDICTION AND VENUE

10.     This Court's jurisdiction arises under 28 *U.S.C.* § 1332(2), Diversity of Citizenship; amount in controversy; costs.  All named parties meet the diversity jurisdiction of this Court.

11.     This Court's jurisdiction is also pursuant to 28 *U.S.C.* § 1332(b), since Plaintiff's damages are greater than Seventy Five Thousand ($75,000.00) Dollars.

12.      The United States District Court, Eastern District of New York, is the proper venue for this action as the causes of action also arose from Defendants' conduct within the jurisdiction of this Court.

## CIRCUMSTANCES OF PLAINTIFF'S ACCIDENT AND
## THE SERIOUS INJURIES PLAINTIFF SUSTAINED

13.     On May 23, 2021, at or about 7:00 p.m. at the Mall, Plaintiff, while lawfully walking to an automobile parked in the Mall's parking lot, tripped and fell on the Mall's unprotected, trap-like and dangerous open space area where no warning signs were posted which was under the control Defendants GGP and Brookfield and maintained by agreement by Defendant Brightview with Defendants GGP and Brookfield.  (Exhibit A).

14.     Plaintiff was propelled over a hidden trap-like metal border that was part of an area bordering the parking lot side of this open space area.  (Exhibit B).

15.     As a result, Plaintiff suffered severe and permanent injuries as a result of Defendants' failure to safely protect this dangerous and hazardous condition, post any warning signs and properly and visibly enclose or maintain this area to protect the numerous individuals, including Plaintiff, who frequent the Mall.

16.     Plaintiff's injuries are and were after the accident as follows:  Plaintiff was treated on May 23, 2021, at Staten Island University Hospital's Emergency Room and diagnosed with a left wrist fracture and placed into a thumb spica splint.  Plaintiff complained of severe pain which was aggravated when moving her left wrist.  Plaintiff received additional medical treatment on May 24, 2021, by an orthopedist, who also diagnosed Plaintiff with a left wrist fracture and having a complaint of back pain.  Plaintiff's left wrist was placed in a cast.  On June 28, 2021, Plaintiff complained of persistent worsening symptoms in the left hand/wrist causing her difficulty using the hand, sleeping and interfering with daily activities.  On October 13, 2021, Plaintiff underwent orthopedic surgery to repair the left wrist fracture (diagnosed as a carpal tunnel injury from the fracture which placed pressure on the median nerve where the fracture occurred).  After the surgery, Plaintiff was required to wear a brace to support her left wrist.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS
### (Negligence)

17.    Plaintiff repeats, reiterates and realleges each and every allegation contained in Paragraphs "1" through "16" as if fully set forth at length herein.

18.    Plaintiff's serious personal injuries were a direct and proximate result of Defendants' negligence, by failing to properly and safely maintain the Mall's public property, especially where Plaintiff was caused to fall by Defendants' negligence acts and/or omissions.

19.    As a result of the above acts, negligence and omissions of Defendants, Plaintiff has been damaged in an amount in excess of the jurisdictional limits of this Court for compensatory damages.

### AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS
### (Reckless Endangerment)

20.    Plaintiff repeats, reiterates and realleges each and every allegation contained in Paragraphs "1" through "19" as if fully set forth at length herein.

21.    Defendants endangered Plaintiff and others when Defendants recklessly engaged in and/or permitted conduct to exist which created a substantial risk of serious physical injury to Plaintiff and others.  (NYS *Penal Law* § 120.20, Reckless endangerment in the second degree, Class A misdemeanor).

22.    Defendants' conduct was reckless, wilful and indifferent to Plaintiff and was a violation of law.

23.    Plaintiff has been damaged by Defendants in an amount in excess of the jurisdictional limits of this Court for compensatory and punitive damages, since Defendants' conduct amounted to willful, wanton negligence and/or recklessness, exhibiting a conscious disregard of Plaintiff's well being by maintaining a dangerous trap like and dangerous condition in an area on the Mall.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANTS
### (Negligent Infliction of Emotional Distress)

24.     Plaintiff repeats, reiterates and realleges each and every allegation contained in Paragraphs "1" through "23" as if fully set forth at length herein.

25.     Defendants negligently inflicted emotional distress upon Plaintiff due to Defendants' conduct.

26.     As a result of the above acts and omissions of Defendants, Plaintiff has been damaged in an amount in excess of the jurisdictional limits of this Court for compensatory damages.

## ATTORNEYS' FEES, EXPENSES AND COSTS

If Plaintiff is the prevailing party in this litigation, Plaintiff seeks attorney's fees, any and all past, present and future medical, aide, prescription, physical therapy expenses, any and all other related expenses concerning this litigation, as well as, any other costs and interest that may be granted.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that this Court enter a judgment against Defendants in favor of Plaintiff for all Causes of Action as set forth above and seeks the following:

A.     An award of damages against Defendants in an amount to be determined at trial, plus interest, to compensate Plaintiff for compensatory damages, including, but not limited to, compensation for Plaintiff's serious personal injury, emotional distress, and for any and all other related expenses and costs.

B.     An award of damages against Defendants in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C.     An award of punitive damages against Defendants in an amount to be determined at trial;

D.      Any prejudgment interest on all amounts due to Plaintiff;

E.      Awarding Plaintiff such additional and further relief, at law or in equity as this Court

may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all claims for monetary damages.

Dated: October 24, 2022                     By:     S/ Arnold N. Kriss, Esq.
                                                    **ARNOLD N. KRISS, ESQ.** (5294)
                                                    **Law Offices of Arnold N. Kriss**
                                                    Attorney(s) for Plaintiff
                                                    123 William Street, 15th Floor
                                                    New York, New York 10038
                                                    (212) 577-2000
                                                    Email: akriss@lawkriss.com

# EXHIBIT A

# Exterior Landscape Maintenance Agreement

EXTERIOR LANDSCAPE MAINTENANCE AGREEMENT

This Exterior Landscape Maintenance Agreement ("Agreement") is made as of March 5, 2019 by and between GGP Staten Island Mall LLC ("Owner") and BrightView Landscapes, LLC ("Service Provider").

A. Owner owns the property commonly known as Staten Island Mall ("Property"), located at 2655 Richmond Avenue Staten Island, NY 10314.

B. Owner desires to engage Service Provider to perform certain exterior landscape maintenance services ("Services") for the Property, and Service Provider desires to perform such Services, all as further provided below and in Exhibit A.

NOW THEREFORE, in consideration of the mutual agreements contained herein, the parties hereto agree as follows:

1. AGREEMENT TERM. The term of this Agreement shall begin on January 1, 2019 ("Commencement Date") and end on December 31, 2021 ("Expiration Date"). If this Agreement has not otherwise been terminated by the then scheduled Expiration Date, this Agreement shall be automatically extended on a month-to-month basis until either party terminates by giving the other party at least thirty (30) days written notice.

2. PAYMENT AMOUNTS. Owner shall pay the payment amounts to Service Provider as set forth on Exhibit A, payable within thirty (30) days of receipt of Service Provider's invoice, with any partial periods pro rated, and with all taxes included in such amounts. Owner's payments for the Services in this Agreement are all-inclusive; Service Provider shall not be entitled to any reimbursement of costs and expenses.

3. PERFORMANCE OF SERVICES. Service Provider shall provide the Services in accordance with Exhibit A and Exhibit C, if attached, all to the satisfaction of Owner and in strict accordance with this Agreement. Service Provider agrees to: (i) perform the Services in a professional workmanlike manner, (ii) dedicate a sufficient number of qualified employees, including supervisory personnel to perform the Services, (iii) maintain good order among its employees performing the Services and remove any employee if Owner requests, (iv) comply with all rules, requirements and programs of the Owner concerning the Services, including any limitations on hours of operations, (v) be completely responsible for all safety precautions and requirements relative to the Services, (vi) coordinate and cooperate with other contractors who are performing services and work at the Property, (vii) perform dangerous or disruptive Services only as scheduled with Owner's consent, which will usually be before or after the hours when the Property is open, (viii) provide all materials, equipment, machinery and tools necessary to perform the Services, (ix) comply with Owners clean-up requirements relating to the Services, and (x) perform the Services in accordance with applicable manufacturers' instructions, specifications, and warranties.

4. SERVICE PROVIDER COVENANTS.

A. Employees. Service Provider shall be considered the sole employer of all employees providing the Services and shall have sole: (i) responsibility for their hiring, supervision, safety, health, compensation, benefits, taxes and other withholding requirements, promotion, discipline, discharge, and all other employer-employee matters, and (ii) liability for all claims arising from such matters.

B. Other Service Provider Parties. Without Owner's express written approval, Service Provider shall not engage any party to perform the Services other than Service Provider's own employees.

C.    Insurance. Service Provider shall provide the insurance coverage set forth on Exhibit B attached hereto and deliver to Owner a certificate of insurance described therein prior to commencement of the Services.

D.    Permits and Taxes. Service Provider shall (i) procure and keep in full force and effect, licenses, permits, bonds or other authorizations necessary to provide the Services, and (ii) unless expressly provided otherwise in Exhibit A, pay all sales, use, service, gross receipts, and other excises and taxes on or respecting the Services, any materials included therein, or otherwise relating to this Agreement.

E.    Compliance With Laws. Service Provider agrees to perform the Services and all of its obligations under this Agreement in compliance with all applicable federal, state and local laws, statutes, ordinances, rules, regulations, codes and other governmental requirements ("Laws").

F.    No Use of Property Name or Picture. Service Provider shall not, while this Agreement is in effect or thereafter, use or permit the use of Owner's name or the name of any affiliate of Owner, or the name, address or any picture or likeness of or reference to the Property, without the written consent of Owner.

5.    SERVICE PROVIDER REPRESENTATIONS. Service Provider and all persons signing for Service Provider below hereby represent and warrant that: (i) this Agreement has been fully authorized, no further approvals are required, and Service Provider is legally authorized to do business in the State in which the Property is located, and (ii) this Agreement is binding on and enforceable against Service Provider in accordance with its terms.

6.    INDEMNIFICATION.

A.    Service Provider shall, to the fullest extent permitted by law, indemnify, hold harmless, defend and reimburse Owner, the property management company for the Property (if any), and all of their direct and indirect parents and subsidiaries, any of their affiliated entities, successors and assigns and any current or future director, officer, employee, partner, member, lender or tenant of any of them ("Indemnified Parties") from and against any and all claims, damages, losses, liabilities, suits, expenses, citations and fines (including attorneys' fees and legal expenses) (collectively, "Claims") which arise out of or are in any way connected with: (i) the Service Provider's negligence in its performance of, or failure to perform, the Services under this Agreement, (ii) any negligence or intentional misconduct of Service Provider or its employees, agents, affiliates or suppliers, directly or indirectly involved in the Services ("Service Provider Parties"), or (iii) any violation of this Agreement by Service Provider Parties.

B.    Without limiting the generality of the foregoing provisions, Service Provider's obligations to indemnify, hold harmless, defend and reimburse under this Section 6 include any and all Claims arising or alleged to arise wholly or partly out of or in any way connected with the Services.

C.    Service Provider's liability under this Agreement shall not be limited to the insurance coverage required to be carried by Service Provider.  The indemnification obligation under this Section shall not be limited by any limitation on the amount or type of damages, compensation or benefits payable by or for Service Provider or a subcontractor under workers' or workmen's compensation acts, disability benefit acts or other employee benefit acts.

D.    Owner may set off against any payments under this Agreement any amounts which Owner determines in good faith are reasonably necessary to protect the Indemnified Parties from any Claims which are made under this Section.  This Section shall survive the expiration or earlier termination of this Agreement.

7.    TERMINATION

A.    Termination for Cause. Either party shall have the right to terminate this Agreement, by giving the other party at least ten (10) days' written notice, if the non-defaulting party determines that the other party has failed to perform any provision of this Agreement. Whether a party cures such performance during such ten (10) day period shall be determined by the non-defaulting party in its reasonable discretion.

B.    Termination Without Cause. Notwithstanding anything to the contrary contained in this Agreement, either party may terminate this Agreement at any time, without cause, by giving the other party at least thirty (30) days' written notice. Alternatively, Owner may elect in writing to discontinue the Services immediately, in which case, Owner shall pay any amount required under this Agreement for the thirty (30) day period following the date of such notice.

C.    Actions Upon Termination. Upon termination, Service Provider shall: (i) prorate Owner's payments pursuant to **Section;** (ii) do all other things reasonably necessary to cause an orderly cessation, or at Owner's option, transition of the Services to Owner or another service provider designated by Owner, without detriment to the continued operation of the Property, and (iii) turn over to Owner all reports, data, service manuals, records, and other materials respecting the Services. Termination of this Agreement shall not affect Owner's right to recover damages for violations of this Agreement or any other rights or remedies of Owner under this Agreement or applicable Laws (all of which shall be cumulative).

D.    Other Remedies. If Service Provider fails to comply fully with any obligations promptly and properly in accordance with this Agreement: (i) Service Provider shall, to the extent required by Owner, re-perform such Services immediately and without additional charge, and (ii) if such failure continues for twenty-four (24) hours after Owner's written request (except that no request shall be required in an emergency), Owner may perform or arrange for another party to perform such obligations, deduct the cost from amounts owing Service Provider, and hold Service Provider liable for any additional costs incurred.

8.    GENERAL PROVISIONS

A.    Entire Agreement. This Agreement, which includes the exhibits referenced herein and attached hereto, sets forth the entire understanding and agreement of the parties with respect to the Property and the subject matter of this Agreement and supersedes all prior agreements, representations, warranties, understandings and commitments of the parties, whether oral or written, with respect thereto (except for any Service Provider indemnities, warranties and other provisions of any prior agreements which survive termination of such other agreements).

B.    Modifications and Amendments. No modification or amendment of any term or condition of this Agreement shall be valid or of any force or effect unless made in writing, signed by the parties hereto or their duly authorized representatives, and specifying with particularity the nature and extent of such modification or amendment.

C.    Assignment. This Agreement may not be assigned, in whole or in part, by Service Provider without the prior written consent of Owner. Owner may freely assign this Agreement to any affiliate or to any other assignee, provided that any such assignee (other than an affiliate) agrees in writing to fulfill all obligations of Owner under this Agreement.

D.    Governing Law; Disputes. This Agreement shall be governed by, construed and enforced in accordance with the laws of the state in which the Property is located, without regard to choice of law or conflicts of laws provisions. THE PARTIES HEREBY WAIVE TRIAL BY JURY. If either party institutes any action or proceeding against the other relating to this Agreement or the Services, the prevailing party shall be entitled to recover all reasonable costs and attorneys' fees from the unsuccessful party.

E.    Reformation and Severability. If any provision or term of this Agreement shall, to any extent, be held invalid, illegal or unenforceable by a court of competent jurisdiction, that provision

3

shall, to the extent possible, be modified in such a manner as to be valid, legal and enforceable but so as to most nearly retain the intent of the parties as expressed herein, and if such a modification is not possible, that provision shall be severed from this Agreement, and in either case the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

F.    Waivers. No waiver of any term or condition of this Agreement shall be valid or of any force or effect unless made in writing, signed by the parties hereto or their duly authorized representatives, and specifying with particularity the nature and extent of such waiver. The failure of a party at any time to exercise any of its rights or options under this Agreement shall not be construed to be a waiver of such rights or options or prevent such party from subsequently asserting or exercising such rights or options, nor shall it be construed, deemed or interpreted as a waiver of, or acquiescence in, any such breach or default or of any similar breach or default occurring later.

G.    Independent Contractor. The parties are independent contractors with respect to one another and to this Agreement and shall not be construed to be the agent of the other under any circumstances. Neither party shall make any express or implied agreements, warranties, guarantees or representations or incur any debt in the name of, or on behalf of, the other or be obligated by or have any liability under any agreement or representations made by the other that are not expressly authorized in writing.

H.    Force Majeure Delays. Neither party shall be liable for any delay or failure to perform its obligations under this Agreement, if such delay or failure is caused by a force beyond such party's control, which forces shall include, but not be limited to, casualty damage, terrorism and bomb threats.

I.    Counterparts. This Agreement may be executed in any number of counterparts and by the parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original and all of which, when taken together, shall constitute one and the same Agreement. Delivery of an executed counterpart of this Agreement by electronic mail or facsimile shall be equally as effective as delivery of a manually executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement electronically or by facsimile shall also deliver a manually executed counterpart of this Agreement; provided, however, the failure to deliver a manually executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement.

J.    Inconsistency Within Agreement. Owner's policy prohibits attaching Service Provider's proposal or agreement form as an exhibit or other attachment to this Agreement. If for any reason Service Provider's proposal or agreement form is so attached, the parties hereby mutually agree that: (i) such item was attached only as a convenience and to expedite the preparation of this Agreement; and (ii) only the portions of such attachment which describe the details, specifications, performance times, and pricing, for the Services shall be deemed to be incorporated into this Agreement, and only to the extent consistent with the other provisions of this Agreement.

K.    Notices. All notices, requests and approvals required under this Agreement must be in writing and addressed to the other party's designated contact(s) for notices as set forth below, or to such other address as such party designates in writing. All such notices, requests and approvals will be deemed to have been delivered either when personally delivered, or upon delivery by either registered or certified mail, postage prepaid with return receipt requested, or by a recognized commercial courier service providing proof of delivery on the date of mailing. The provisions of this Section shall survive termination of this Agreement. The parties' initial addresses for notices, requests and approvals as described herein are as follows:

4

To Owner:
GGP Staten Island Mall, LLC
2655 Richmond Avenue
Staten Island, NY 10314

Attn:  General Manager

*With a copy to:*
Brookfield Properties
350 N. Orleans St., Suite 300
Chicago, Illinois 60654-1607
Attn:  Legal Department -- Corporate Contracts and Securities

To Service Provider:
BrightView Landscapes, LLC
1350 Liberty Avenue Unit C Bldg 22
Hillside, NJ 07205
Attn:Jeffrey Wood

*With a copy to:*

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the day and year first above written.

OWNER:  GGP Staten Island Mall, LLC a Delaware limited liability company

By: _____
          Authorized Signatory

SERVICE PROVIDER:
BRIGHTVIEW LANDSCAPES, LLC

BY:  _____
NAME:  Andrew Hart
TITLE:  Vice President - Finance
TAXPAYER NUMBER (FEIN): _____

6

## EXHIBIT A

### EXTERIOR LANDSCAPE MAINTENANCE

**PAYMENT AMOUNT; PAYMENT SCHEDULE**

Owner agrees to pay Service Provider the sum of   payable as follows:

| Date Due | Payment Amount |
|---|---|
| Year 1 1/1/19 through 12/31/19 -- 1st of month | January & February |
|  | March thru December |
| Year 2 1/1/20 through 12/31/20- 1st of month | (tax inclusive) |
| Year 3- 1/1/21 through 12/31/21- 1st of month |  |
|  |  |

**SERVICES**

Service Provider will be responsible for providing the following Services: [The Services are all within landscaped areas on the Property, unless otherwise specified.

**LAWN CARE:**

1. Turf shall be cut at a height of 3" to 4" depending on growth since last cut. 28 mowing occurrences will take place between April 15 to November 15. Mowing equipment and patterns shall be employed to permit recycling of clippings where possible, to present a neat appearance. Excess clippings shall be removed. Blades on all equipment shall be sharp to prevent tearing of the grass blades.
2. String trim obstacles in Turf areas.
3. Turf adjacent to walks and curbs shall be edged enough to maintain neat appearance.
4. A pre-emergence crabgrass control shall be applied to turf 2 times during the Spring Season to prevent crabgrass seeds from sprouting.
5. A post emergent crabgrass control shall be sprayed on all turf 3 times per season to control broadleaf weeds.
6. A quality turf fertilizer shall be applied 4 times per season providing a total maximum of 3 pounds of actual nitrogen per 1,000 square feet per season. Timing, frequency, and rate of application shall be adjusted to meet horticultural conditions.
7. Monitor and report any turf disease/pest problems to property manager on a weekly basis. Insect control application shall be made 1 time during the summer season to control surface and sub-surface insects.
8. Core aeration and broadcast seed application for turf areas.

**SHRUB, EVERGREEN AND PLANTER BEDS:**

1. All beds shall be cultivated and maintained to present a neat weed-free appearance by hand weeding weekly during routine service visits.
2. All shrub and evergreens, plants and trees shall be pruned and shaped 2 times per year and kept at a 2" minimum away from building structures. And as needed on a weekly basis, to remove dead or damaged branches, develop the natural form of the plant, and to create the effect intended by the landscape architect,

3.  A pre-emergence weed control shall be applied to all beds 1 time in the Spring.
4.  A post-emergent herbicide (Round Up) shall be applied to all beds throughout the season as needed.
5.  A quality planter and flower bed fertilizer shall be applied 3 times throughout the season.
6.  Turf adjacent to beds shall be edged 1 time per season to prevent encroachment of turf and present a neat appearance.
7.  Perennial flowers shall e maintained as necessary throughout the season by cutting back, cleaning, and dead-heading.

TREES AND LAWN EVERGREENS: (Up to 12' IN HEIGHT):

1.  An edged ring shall be maintained at the base of all lawn trees where applicable 2 times per season.
2.  All trees and evergreens shall be spot pruned throughout the season to remove dead, low-hanging, or damaged branches below 12' in height and develop the natural form of the plant.
3.  Prune all trees at a 2" minimum away from building structures.

HARD SCAPE AREAS:

1.  Remove and spray herbicide on all visible weeds in cracks or joints on property sidewalks, waterways, gutters, roadways, light pole bases and parking/delivery surface areas weekly.
2.  Police grounds, blow or sweep all grass and weed debris from all sidewalks, roads, parking lots, and gutters after mowed areas weekly.

ANNUALS/SEASONAL PLANTINGS:

1.  SUMMER ANNUALS- 5"- 400 COUNT
2.  FALL PANSIES, 5" – 600 COUNT
3.  BULBS-DAFFODILS/TULIPS-650 COUNT

MULCH:

1.  Quality double shredded hardwood mulch shall be applied 2 times per landscape season with a 2" depth, totaling 335 cubic yards.

IRRIGATION:

1.  Monitor and report any irrigation system damage or problems to property manager-weekly.
2.  Irrigation shall be turned on by contractor in the Spring.
3.  Contractor shall conduct a midseason check of the system.
4.  Irrigation shall be turned off and winterized by contractor in the Fall.

SPRING/FALL CLEAN-UP:

1.  A Spring clean-up to include a thorough clean-up of landscape areas, including removal and disposal of all leaves, weeds, trash, and debris from all lawn, tree/shrub, and planting beds for the entire Property.
2.  A Fall clean-up to include a thorough clean-up of landscape areas, including removal and disposal of all leaves, weeds trash, and debris from all lawn/tree/shrub, and planting beds for the entire Property autumn.
3.  Remove and dispose of any dead annual and perennial flowers during frost or by end of clean-up period.

**WINTER POLICING:**

1. Monitoring the grounds and policing of debris shall be done during the Winter month (Approximately November 1st through March 30th).

| DESCRIPTION | QTY |
|---|---|
| Mow and Trim Turf | 28 |
| Edge Bed Lines | 6 |
| Edge Curbs and Walks | 5 |
| Bed Weed Control | 28 |
| Tree Pruning | 2 |
| Shrub/Ground Cover Pruning | 2 |
| Insect Disease Control | 6 |
| Irrigation Management | 40 |
| Irrigation Winterization | 1 |
| Irrigation Start Up | 1 |
| Shrub Fertilization | 1 |
| Ground Fertilization | 1 |
| Plant Annual Flowers | 1 |
| Plant Pansies | 1 |
| Plant Bulbs | 2 |
| Water Pots | 8 |
| Turf Fertilization | 1 |
| Turf Weed Control-Pre-emergent | 2 |
| Turf Weed Control Post emergent | 3 |
| Aerate and Over Seed | 1 |
| Spring Clean-up | 1 |
| Fall Clean-up | 2 |
| Mulch Application | 336 yds |
| Debris Disposal | 62 |

## EXHIBIT B

### INSURANCE REQUIREMENTS

REQUIRED INSURANCE.

Service Provider shall furnish and maintain in effect during the term of the Agreement the insurance coverage described below:

| | |
|---|---|
| **Commercial General Liability** | $1,000,000 Occurrence/$2,000,000 Aggregate |
| **Contractors Pollution Liability** | $2,000,000 Occurrence |
| **Commercial Automobile Liability** | $1,000,000 Combined Single Limit |
| **Workers' Compensation** **Employers' Liability** | Statutory<br>$500,000 Each Accident<br>$500,000 Disease, Policy Limit<br>$500,000 Disease, Each Employee |

OR

| | |
|---|---|
| **(for Monopolistic States)** **Workers' Compensation** **Stop Gap Employers' Liability** | Evidence of Monopolistic State Coverage<br>$500,000 Occurrence/Aggregate |

POLICY REQUIREMENTS.

The insurance required of Service Provider shall be issued by an insurer or insurers lawfully authorized to do business in the jurisdiction in which the Property is located, and maintaining an AM Best rating of at least A- VII.

The Commercial General Liability insurance required shall name, as **"Additional Insureds"**, Owner (exactly as identified herein), Brookfield Property REIT Inc. Brookfield Properties Retail Inc. and BPR REIT Services LLC. The Commercial General Liability Insurance shall include a Pesticide and Herbicide Endorsement using the ISO CG 28 12 10 01 form or a similar type of endorsement forms.

All insurance policies shall contain waivers of any and all rights of subrogation against the Additional Insureds, and shall contain either a cross-liability endorsement or separation of insureds provision, which provision shall permit the limits of liability under Service Provider's policies to apply separately to each Additional Insured.

All Insurance policies required by this Agreement shall state that they are primary and not additional to, or contributing with, any other insurance carried by, or for the benefit of the Additional Insureds with respect to the negligence of Service Provider, its employees, agents, contractors and/or subcontractors.

Before the commencement of any Services, the Property shall be furnished valid and original certificate(s) of insurance evidencing that all required Insurance coverages are in force. All insurance policies required by this Agreement shall bear an endorsement prohibiting such policy from being canceled, allowed to lapse or substantially modified without thirty (30) days prior written notice to Owner, except for non-payment of premium for which ten (10) days notice shall be provided.

Compliance with the insurance requirements of this Agreement shall not be relieved by Owner's, or any Property's, receipt or review of any insurance certificates.

<u>EXHIBIT G</u>

SUPPLEMENTAL TERMS AND PROVISIONS

1.     <u>HAZARDOUS MATERIALS AND WASTE</u>

A.     Service Provider warrants that (a) the materials to be supplied shall not contain asbestos, polychlorinated biphenyls (PCB's), waste oils, creosote, or banned refrigerants, (b) paint shall not contain lead, and (c) any pesticides shall be registered in compliance with the Federal Insecticide, Fungicide and Rodenticide Act, and the registration shall not have expired.

B.     Service Provider shall not conduct, allow, or authorize the handling of any hazardous materials or materials banned or regulated under environmental, health, or safety laws on the Property.  If any of the materials it uses or applies require labeling, posting of warning signs, limitation of access to the work area or the area where the materials are stored, or other precautions, Service Provider shall inform Owner in advance and Service Provider shall be solely responsible at its cost for taking appropriate precautions. All signage to be posted on the Property shall be subject to Owner's approval as to content, design and location.  Such approval shall not be unreasonably withheld.

C.     Service Provider shall not take any action that would subject the Property to permit requirements for the storage, treatment, or disposal of hazardous wastes or petroleum or petroleum by-products including, but not limited to, requirements under the Federal Resource Conservation and Recovery Act or state or local laws and regulations.

D.     Service Provider shall not cause or allow the release, disposal of, or abandonment of any hazardous substances on the Property so as to subject the Property to the Federal Comprehensive Environmental Response, Compensation, and Liability Act or equivalent state laws.

E.     Service Provider shall not cause or allow the release or discharge of any hazardous wastes or substances, nuclear or radioactive materials, refrigerants, or petroleum or petroleum by-products into the ambient air, drains, sewers, sumps, wells, underground storage tanks, wetlands, ditches, soils, retention or detention ponds, surface waters, or ground water on or under the Property, provided, however, that if by their nature Service Provider's services reasonably include the application of pesticides, herbicides, rodenticides, fungicides, fertilizers, road salt, deicers, wood preservatives, sealants, paint, plaster, joint compound, roofing compounds, tar, asphalt, surfactants, refrigerants, cleaning compounds, caustics, acids, abrasives, adhesives, solder, or other such materials reasonably necessary for the performance of the Service, Service Provider shall use only lawful materials and shall apply such materials using the amounts, concentrations, and methods recommended by the manufacturer and shall take all reasonable precautions against creating a nuisance, causing an unlawful discharge, or harming people, property, or the environment.

F.     Service Provider shall not disturb any asbestos containing materials (ACM) in or near the work area.  In the event Service Provider suspects that any ACM are located in or around the area(s) in which Service Provider is rendering services, Service Provider shall advise the Owner of the suspected ACM before beginning to render the Services.

G.       Service Provider shall not dispose of any containers, raw materials, residue, off-specification materials, or wastes into any dumpsters or trash containers that may be located on the Property for the use of Owner or its tenants or other contractors.  Instead, Service Provider shall place them in appropriately labeled, covered, and secured dumpsters or containers provided for the specific purpose by Service Provider and Service Provider shall remove them at the conclusion of the Services. No temporary storage of wastes in Service Providers' dumpsters or containers shall exceed 30 days, even if Service Provider's services at the Property require more than 30 days.

H.       At its sole cost, Service Provider shall arrange for the lawful transportation and off-site disposal of all hazardous substances, residues, materials, and wastes that it generates but does not use or apply in the performance of the Services and that cannot be placed in Owner's dumpsters or containers.  This paragraph shall survive the expiration or termination of this Agreement.

2.       RECYCLABLE MATERIALS

A.       Service Provider shall, at its sole cost, recycle any and all waste collected or generated in the performance of the Services that is capable of being recycled including, without limitation, foliage, trees, leaves, grass clippings, weeds, mulch or any portion thereof (collectively "Recyclable Materials").  For purposes of this Agreement, to "recycle" means to convert Recyclable Materials into compost, mulch or similar materials for later use by Service Provider.  Incineration shall not be an acceptable method of recycling.  Owner shall have the right, in its reasonable discretion, to approve Service Provider's method of recycling the Recyclable Materials.

B.       Within thirty (30) days after the end of each calendar quarter during the term of this Agreement, Service Provider shall provide to Owner a report (substantially in the form attached to this Agreement as Schedule 1) detailing the amount and type of Recyclable Materials recycled during the previous calendar quarter.

SCHEDULE 1

RECYCLING REPORT

**FOR TIME PERIOD:**
BEGINNING: _____
ENDING: _____

Property Name: _____
City: _____
State: _____

Service Provider: _____
Service Provider's Telephone Number: _____

| **MATERIAL** | **WEIGHT RECYCLED (IN CUBIC YARDS)** |
|---|---|
| GRASS CLIPPINGS | _____ |
| TREES, BRANCHES | _____ |
| LEAVES | _____ |
| MULCH | _____ |
| FOLIAGE | _____ |
| OTHER | _____ |
| | |
| **TOTAL** | _____ |

I hereby certify that, to the best of my knowledge and belief, the information contained in this report for the reporting period specified above is accurate, complete and verifiable.

Signature: _____
Name: _____
Date: _____

# EXHIBIT B

# PHOTOGRAPHS













**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x
ADELE BASILE,

                          **Plaintiff,**

                **- against -**

GGP STATEN ISLAND MALL, LLC,
BROOKFIELD PROPERTIES RETAIL INC., and      **Case No. 1:22-cv-02572 (RER)**
BRIGHTVIEW LANDSCAPERS, LLC,

                      **Defendants.**
--------------------------------------------------------------------x

---

### CORRECTED SECOND AMENDED COMPLAINT

---

**ARNOLD N. KRISS, ESQ.**
**LAW OFFICES OF ARNOLD N. KRISS**
**Attorneys for Plaintiff**
**Office & P.O. Address**
**123 William Street, 15th Floor**
**New York, New York 10038**
**(212) 577-2000**
**akriss@lawkriss.com**